PROMETHEUS PARTNERS LLP
EDUARDO G. ROY (SBN 146316)
eduardo.roy@prometheus-law.com
The Mills Tower
220 Montgomery Street, Suite 1094
San Francisco, CA 94104
Telephone: 415.527.0255

Attorney for Defendant
SANJIV KAKKAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

SANJIV KAKKAR,

Defendant.

Case No. 5:13-cr-00736-EJD

**DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR CORRECTION OF PRESENTENCE INVESTIGATIVE REPORT**

Date: April 3, 2017
Time: 1:30 p.m.
Dept: Courtroom 4
Judge: Hon. Edward J. Davila

## TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. LEGAL ARGUMENT ..... 2

A. The PSR Proposes an Incorrect Offense Level due to Improper Calculation of Loss. ..... 2

1. Loss is harm that resulted from criminal conduct. ..... 3

2. The Government asserted a theory of fraud after loan approval. ..... 3

3. The post-approval fraud asserted at trial supports an upward adjustment of 12 levels. ..... 4

4. A 2-level adjustment under USSG § 2B1.1(b)(16)(A) is not supported. ..... 4

5. The loss asserted in the PSR is not based on evidence in the record. ..... 5

6. The proper offense level for sentencing is 19, corresponding to a range of 30 – 37 months incarceration. ..... 6

7. The Court should consider a downward departure based on extrajudicial punishment. ..... 6

B. The Court Should Not Impose Restitution. ..... 7

1. The Government has not discharged its burden to prove the proposed amount of restitution is proper. ..... 8

2. Documentation outside the record discloses significant errors or omissions in calculation of the proposed amount of restitution. ..... 8

3. The Court should decline to hold further proceedings regarding restitution. ..... 10

III. OBJECTIONS TO AND MOTION TO CORRECT THE PSR ..... 10

IV. CONCLUSION ..... 15

# TABLEOF AUTHORITIES

Page

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) .......... 2

*New Hampshire v. Maine*, 532 U.S. 742 (2001) .......... 4

*United States v. Boccagna*, 450 F.3d 107 (2d Cir. 2006) .......... 10

*United States v. Booker*, 543 U.S. 220, 245 (2005) .......... 6

*United States v. Gaind*, 829 F.Supp. 669 (S.D. N.Y. 1993) .......... 7

*United States v. Howard*, 894 F.2d 1085 (9th Cir. 1990) .......... 5

*United States v. Napae Luta Young*, 272 F.3d 1052 (8th Cir. 2001) .......... 8

*United States v. Redemann*, 295 F.Supp.2d 887 (E.D. Wis. 2003) .......... 6, 7

*United States v. Ringgold*, 571 F.3d 948 (9th Cir.2009) .......... 6

*United States v. Whiting,* 471 F.3d 792 (7th Cir. 2006) .......... 3

*United States v. Yeaman*, 194 F.3d 442 (3d Cir.1999) .......... 3

*United States v. Yeung*, 672 F.3d 594 (9th Cir. 2012) .......... 10

**Statutes**

18 U.S.C. § 3553(a) .......... 6

18 U.S.C. § 3663A .......... 7, 8, 10

8 U.S.C. § 1251 .......... 7

**Other Authorities**

USSG § 2B1.1 note 3(A) .......... 3, 4

USSG § 2B1.1 note 3(D) .......... 3, 4

USSG § 2B1.1(b)(1) .......... 3

USSG § 2B1.1(b)(16) .......... 5

USSG § 5 pt. A .......... 6

USSG §5E1.1(a)(1) .......... 7

Defendant Sanjiv Kakkar hereby submits his Sentencing Memorandum and contests and requests correction of matters in the Presentence Investigation Report ("PSR," ECF 158) as set forth below.

## I. **INTRODUCTION**

Defendant Sanjiv Kakkar was convicted of one count of making false statements to a financial institution and six counts of wire fraud. As in most financial crimes, the major factor in sentencing is the amount of associated loss. Here, the PSR grossly overstates the loss, the offense level, and (consequently) the punishment that should be imposed.

The PSR asserts a $3.1 million loss to the State Bank of India (California) ["SBIC"], and a corresponding Guideline offense level of 25. This is based on a premise that Mr. Kakkar obtained a $6 million loan through fraud, and that the entire principal (less recovery on collateral) must be included in the loss calculation. But the Government's theory at trial concerned fraud **after** the loan was approved. Consequently, the maximum attributable loss is approximately $510,000[1] in construction draws taken after loan approval. The proper Guideline offense level based on this loss figure is 19, and Mr. Kakkar should be sentenced accordingly.

The amount of loss is equally important for the issue of restitution. The PSR recommends a $4.2 million restitution order in favor of SBIC.[2] This figure is based on the same improper assumption of causation as the loss figure for offense level. Again, the theory of conviction was fraud **after** loan approval—the full loan amount is not loss attributable to fraud and cannot be used as a basis for restitution. Just as important, the PSR's restitutionary loss figure is based on documents outside the record—a pending summary judgment motion in a civil action by SBIC—that set forth a defective calculation. Among other things: (1) the calculation is based on the full loan value of $6 million when Mr. Kakkar only made use of $5 million; (2) the calculation fails to

---

[1] Government discovery shows that submissions to receive construction draws included about $60,000 in materials invoices never alleged to be false or fraudulent, but the offense level is the same for loss amounts of $510,000 or $450,000 and these documents are currently outside the record. Mr. Kakkar reserves his rights to raise this issue in the event the Court holds an evidentiary hearing on the loss amount for purposes of offense level and/or restitution.

[2] This figure purports to include interest and is higher than the loss figure for calculation of offense level.

account for $623,000 of insurance proceeds to which SBIC had rights; and (3) the calculation fails to account for the fact that SBIC sold the Brookdale Inn to itself, which does not establish fair market value of collateral for purposes of calculating restitution.

Even starting from a proper position of loss causation, the evidence in the record does not show that SBIC suffered a loss supporting restitution. Moreover, given the complexity of the calculation and the fact that there is a pending civil action by SBIC, the Court should decline to order restitution and defer to the civil court determination.

Mr. Kakkar respectfully submits that the proper offense level is 19, and that he should receive a sentence at the lower end of the Guideline range, or below based on extrajudicial punishment including likely deportation. Mr. Kakkar further submits that no restitution should be ordered based on the record before the Court.

## II. LEGAL ARGUMENT

### A. The PSR Proposes an Incorrect Offense Level due to Improper Calculation of Loss.

Although the Sentencing Guidelines are merely advisory, *United States v. Booker*, 543 U.S. 220, 245 (2005), "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" because "the Guidelines should be the starting point and the initial benchmark" when imposing a sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007).

Here, the PSR states that the offense level is 25, including: (1) a base of offense level of 7; (2) a 16-level increase for a loss amount of $3,116,730; and (3) a 2-level increase for deriving more than $1 million in gross receipts from a financial institution as a result of the offense. (ECF 158 at ¶¶ 29-38.)

Mr. Kakkar acknowledges the proper base offense level is 7. He contests both adjustments.

1. **Loss is harm that <u>resulted</u> from criminal conduct.**

The Guidelines provide for upward adjustment of the offense level for financial crimes based on amount of loss. USSG § 2B1.1(b)(1). This figure "is the greater of actual loss or intended loss [to the victim]." USSG § 2B1.1 note 3(A).

"Actual loss" is "the reasonably foreseeable pecuniary harm that **<u>resulted</u>** from the offense." USSG § 2B1.1 note 3(A)(i) (emphasis added). This measure focuses on the real, pecuniary loss to the victim, and requires a causal link between the loss suffered and the charged conduct. *See, e.g., United States v. Whiting,* 471 F.3d 792, 802 (7th Cir. 2006); *United States v. Yeaman*, 194 F.3d 442, 456-57 (3d Cir.1999) ("[T]he plain meaning of 'resulted from' connotes causation.")

"Intended loss" is "the pecuniary harm that the defendant purposely sought to inflict." USSG § 2B1.1 note 3(A)(ii). "Interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs" are specifically excluded from the amount of loss for determining offense level. USSG § 2B1.1 note 3(D)(i). When the amount of loss cannot be reasonably determined, the Court may use the amount of gain to defendant in order to calculate the offense level.

2. **The Government asserted a theory of fraud <u>after</u> loan approval.**

In Count One of the Superceding Indictment (ECF 70), the Government charged Mr. Kakkar with making false statements to a bank (and aiding and abetting) in violation of 18 U.S.C. §§ 1014 and 2. In support of these charges, the government alleged Kakkar made (or caused to be made) false statements to SBIC in "[i]n order to secure the loan" from SBIC. (ECF 70 at ¶ 7.)

Although this language on face of the superceding indictment appeared to allege that Mr. Kakkar **<u>obtained</u>** his loan from SBIC based on submission of false tax returns for the years 2007 and 2008. But the Government adopted a different theory at trial.

The Government did not put on any evidence that Mr. Kakkar provided false tax returns prior to loan approval. Instead, the Government argued and alleged that Mr. Kakkar submitted false tax returns **<u>after</u>** the loan was approved in order to prevent or delay foreclosure or other adverse action by the bank. (*See, e.g.*, Transcript p. 36:12-39:3 [Oct. 31, 2016].) Having obtained

a conviction by arguing fraud after Mr. Kakkar obtained his loan from SBIC, the Court should reject any Government assertion that he obtained the loan through fraud. *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (holding judicial estoppel prevents a party from benefiting through taking inconsistent positions in litigation).

Here, the only possible loss for sentencing purposes would be equal to the amount of the loan proceeds disbursed for renovation after approval. Under the Government's theory used to obtain conviction, the submission of false tax returns after loan approval may have enabled the conduct underlying the wire fraud Counts 2 through 7—i.e., obtaining approximately $510,000 in construction draws. But post-approval fraud cannot support loss based on loan disbursals prior to the fraud.

Whether SBIC suffered a loss on the $4.5 million portion of the loan used for refinance purposes,[3] there can be no "but for" connection between the criminal conduct and any such loss loss. Once the loan was issued and proceeds applied to the previous mortgage (which SBIC held), SBIC would have potentially lost that amount on default whether or not a subsequent fraud occurred.

**3. The post-approval fraud asserted at trial supports an upward adjustment of 12 levels.**

As discussed herein, it is not actually clear that SBIC suffered an actual loss for sentencing or restitution. However, Mr. Kakkar acknowledges that the construction draws underlying his conviction on Counts 2 through 7 could be used to support an intended loss (or a gain) in the amount of $510,000.[4] USSG § 2B1.1 notes 3(A)(ii), 3(D)(i). This loss figure adds 12 to the base offense level. USSG § 2B1.1(b)(2)

**4. A 2-level adjustment under USSG § 2B1.1(b)(16)(A) is not supported.**

The PSR proposes a 2-level increase for deriving more than $1 million in gross receipts from a financial institution. (ECF 158 at ¶¶ 29-38.) The relevant provision of the Guidelines

[3] As discussed herein, it is not actually clear that SBIC suffered an actual loss for sentencing or restitution on this portion of the loan

[4] Again, if there is an evidentiary hearing, Mr. Kakkar reserves his right to contest whether the full amount of the construction draws was fraudulent.

provides for such increase if "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a **result** of the offense." USSG § 2B1.1(b)(16)(A) (emphasis added).

This adjustment is improper for the same reason that the loss figure in the PSR is improper—lack of causation.

Because the Government asserted fraud **after** approval of the SBIC loan, the Government cannot assert that the entire SBIC loan was the "result" of offenses committed. As with the loss figure, the theory of the case and evidence at trial show that Mr. Kakkar derived a maximum of $510,000 as a result of offenses underlying conviction. This is obviously below the $1 million threshold, and the 2-level increase is therefore inapplicable.

5. **The loss asserted in the PSR is not based on evidence in the record.**

The government bears the burden of establishing the existence of any factor that increases the guideline range. *See United States v. Howard*, 894 F.2d 1085, 1090 (9th Cir. 1990). The government has not satisfied that burden.

The PSR makes a conclusory assertion that "[t]he loss amount to SBIC was $6,316,729.82, which include principal, security costs, maintenance, payment for the clearing of taxes owed by the defendants, and insurance." (ECF 158 at ¶ 24). The PSR then deducts $3.2 million in proceeds from a trustee sale to arrive at a final loss figure of $3,116,729.82 for purposes of calculating offense level.

The PSR does not cite any evidence to support the loss figure. The reason why is that there is no evidence in the record. The PSR's loss calculation is based on documents outside the record that were provided to probation by the Government after trial. (Decl. of Eduardo G. Roy ¶ 2 and Ex. A.) Specifically, the Government provided probation with summary judgment papers filed by SBIC in a civil action against Mr. Kakkar and which were not introduced into evidence at trial. (Decl. of Eduardo G. Roy ¶ 2 and Ex. A.)

As discussed above, the loss amount in the PSR is improper because it does not account for causation. But even if the legal position embodied in the PSR were correct, the Government has not discharged its burden to introduce evidence proving the loss amount asserted.

**6. The proper offense level for sentencing is 19, corresponding to a range of 30 – 37 months incarceration.**

Based on an offense level of 25, the PSR recommends a 57-month sentence of incarceration (concurrent on all counts). (ECF 158 p. 23). Based on offense level and criminal history, this recommendation is at the bottom of the Guideline range. USSG § 5 pt. A (sentencing table).

As set forth above, the proper offense level based on loss amount is 19. Based on Mr. Kakkar's criminal history category of I, this corresponds to a sentencing range of 30 – 37 months. USSG § 5 pt. A (sentencing table). Mr. Kakkar respectfully submits that a 30-month sentence of incarceration is therefore appropriate.

**7. The Court should consider a downward departure based on extrajudicial punishment.**

After calculating the proper offense level under the Guidelines and giving the government and the defendant the opportunity to argue for the sentence they believe to be appropriate, the district judge must consider each of the factors enumerated in 18 U.S.C. § 3553(a) and "tailor the sentence" to fit the circumstances of the case. *United States v. Booker*, 543 U.S. 220, 245 (2005). The import of the *Booker* decision is that the Guidelines are advisory in nature, and sentencing judges have broad discretion to impose a non-guideline sentence by weighing the factors under § 3553(a). *See United States v. Ringgold*, 571 F.3d 948, 950 (9th Cir. 2009).

Applying § 3553(a), District Courts have departed downwards on length of incarceration when extrajudicial effects of conviction serve the same goals as incarceration. That is, if the effect of conviction is to significantly punish the defendant in other aspects of his life and the public is protected from potential recidivism, a lengthy incarceration is unnecessary.

In *United States v. Redemann*, 295 F.Supp.2d 887, 897 (E.D. Wis. 2003), the Court departed downward, in part, because "defendant lost a lot before he ever set foot in this courtroom." Through a related civil enforcement action by the OCC, the defendant had been barred from future involvement with federally regulated financial institutions. *Id.* The Court stated that these consequences would "deter him from future misconduct, which mitigates the need to protect the public from further crimes," and serves general deterrence as well because

"someone else in defendant's position tempted to also become involved in such a scheme need only consider what happened to defendant in order to reconsider." *Id.*

Similarly, in *United States v. Gaind*, 829 F.Supp. 669 (S.D. N.Y. 1993), the Court justified leniency on the following grounds:

> [T]he destruction of defendant's business has already achieved to a significant extent some although not all of the objectives otherwise required to be sought through the sentencing process. Elimination of the defendant's ability to engage in similar or related activities – or indeed any major business activity – for some time, and the substantial loss of assets and income resulting from this have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake, and constitutes a source of both individual and general deterrence. Others engaged in similar activities or considering engaging in them have doubtless already learned through informal sources that loss of the business entity involved is an obvious consequence of such illegal behavior. Because of the destruction of the defendant's [] business, the necessity for achieving the purposes of sentencing through sentencing itself has been reduced.

*Id.* at 671 (emphasis added).

Mr. Kakkar has suffered and will continue to suffer similar extrajudicial punishments that lessen the need for incarceration. As an initial matter, Mr. Kakkar's felony criminal history would effectively prevent him from obtaining loans that could be used as the basis for similar crimes. In addition, the Government is likely to seek deportation under 8 U.S.C. § 1251(a)(2)(A)(iii) for commission of a crime involving moral turpitude. Deportation serves many of the same goals as incarceration, including deterrence, punishment, and protection of the public. Mr. Kakkar therefore respectfully requests that the Court consider a downward departure based on the likely extrajudicial consequences of conviction.

**B. The Court Should Not Impose Restitution.**

The PSR correctly notes that restitution should generally be ordered in favor of an identifiable victim based on the crimes of conviction. 18 U.S.C. § 3663A; USSG §5E1.1(a)(1). Based on this, the PSR recommends restitution in the total amount of $4,208,565.36 in favor of SBIC. (ECF 158 ¶ 84.) Mr. Kakkar objects to this figure.

1. **The Government has not discharged its burden to prove the proposed amount of restitution is proper.**

The burden is on the Government to prove the amount of restitution by a preponderance of the evidence. 18 U.S.C. § 3663A(e); *see also United States v. Napae Luta Young*, 272 F.3d 1052, 1056 (8th Cir. 2001) (overturning restitution order where PSR "contained no specific factual allegations substantiating" amount of restitution and government did not submit evidence).

As is the case with the loss calculation, to PSR does not cite any evidence to support the restitution figure, nor does it describe how the amount was calculated. And also as with the loss calculation for offense level, the calculation appears to be based on documents outside the record that were provided to probation by the Government after trial. (Decl. of Eduardo G. Roy ¶ 2 and Ex. A.) As such, the Government has not discharged its burden and the Court should not order restitution in the amount proposed.

2. **Documentation outside the record discloses significant errors or omissions in calculation of the proposed amount of restitution.**

As noted previously, in order calculate loss and restitution, the Government provided probation with summary judgment papers filed by SBIC in a civil action against Mr. Kakkar. (Decl. of Eduardo G. Roy ¶ 2 and Ex. A.) Again, these documents have never been received into evidence here.

In addition, the summary judgment papers filed by SBIC are (not surprisingly) self-serving and contain several errors and omissions that improperly inflate the claimed restitution. More specifically, and as an offer of proof, Mr. Kakkar notes the following:

- The amount of the loss claimed by SBIC in Ms. Sutt's declaration appears to be based on the full $6 million amount of the loan, less payments received against principal, claiming an outstanding principal balance of $5,746,502.86. It is not limited to loss based on the post-approval fraud alleged at trial. (Decl. of Eduardo G. Roy Ex. A at ¶ 41.)
- As recited in Ms. Sutt's declaration, $4.5 million of the $6 million loan was used to refinance a previous loan on the Brookdale Inn, with the balance of $1.5 to be disbursed through a funds controller for purposes of renovation. (Decl. of

Eduardo G. Roy Ex. A at ¶¶ 9, 18.) But as the Government alleged in the Superceding Indictment, and as supported by evidence at trial, $510,000 of the renovation funds were disbursed to Mr. Kakkar. (ECF 70 at p. 5.) The calculation in Ms. Sutt's declaration therefore fails to account for $990,000 in loan principal.

- Ms. Sutt's declaration recites that under the terms of SBIC's Deed of Trust, the bank had the right to receive insurance proceeds arising from loss or damage to the Brookdale Inn, and that after 180 days, any proceeds not disbursed for restoration and repair would be applied to outstanding amounts due under the terms of the loan. (Decl. of Eduardo G. Roy Ex. A at ¶ 17.) Ms. Sutt further recites that insurance proceeds in the amount of $2,080,000 were received by SBIC after a fire at the Brookdale Inn, and that an agreement was reached between SBIC and Mr. Kakkar regarding application of proceeds. (Decl. of Eduardo G. Roy Ex. A at ¶¶ 20, 21.) However, the document cited by Ms. Sutt as memorializing that agreement only accounts $1,457,000 of the insurance proceeds, leaving $623,000 unaccounted for. (Decl. of Eduardo G. Roy Ex. A at ex. 14.)
- Because the claimed loss by SBIC does not appear to account for at least $1,613,000 in undisbursed funds and insurance proceeds retained by SBIC, it is impossible to determine whether SBIC's calculation of $1,091,835.54 in interest owing as of foreclosure (*see* Decl. of Eduardo G. Roy Ex. A at ¶ 41) is accurate.
- The summary judgment papers submitted by SBIC in the civil case disclose that the bank did not actually sell the Brookdale Inn at a trustee sale as recited by the PSR. Instead, SBIC actually acquired the property by making a credit bid. (Decl. of Eduardo G. Roy Ex. A at ¶ 38.) A credit bid by the lender does not definitively establish the fair market value of collateral for purposes of either loss calculation or restitution. *United States v. Yeung*, 672 F.3d 594, 602 (9th Cir.

2012); *United States v. Boccagna*, 450 F.3d 107, 119-20 (2d Cir. 2006).[5]

In short, even if the documentation apparently relied upon by probation were introduced into evidence, those documents do not support the restitution figure asserted.

3. **The Court should decline to hold further proceedings regarding restitution.**

The Court may decline to order restitution if "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 USCS § 3663A(c)(3)(A).

As noted immediately above, the amount of restitution claimed by SBIC is far from clear, and would require resolution of factual issues including: (1) disposition of insurance proceeds; (2) disposition of loan funds never disbursed to Mr. Kakkar; (3) fair market value of the Brookdale Inn; and (4) proper calculation of interest after accounting for these factors. In addition, even if loss and restitution is properly confined to loss caused by the a post-approval fraud underlying conviction, the calculation of restitution would still require evaluation of the factors above to ascertain whether SBIC actually suffered a compensable loss.

The need to provide restitution is minimal because SBIC can and actually is asserting its interests in a pending civil action, and a proper restitution determination would needlessly complicate and prolong sentencing. Mr. Kakkar therefore respectfully requests that the Court decline to hold additional proceedings on the issue.

## III. OBJECTIONS TO AND MOTION TO CORRECT THE PSR

In addition to the matters set forth above, Mr. Kakkar objects to and requests correction or deletion of the following factual assertions in the PSR. Many of the "facts" recited are not supported by, and in many cases are contradicted by, evidence at trial.

**P. 4 ¶ 8** – The first sentence is accurate. Mr. Kakkar objects to the remainder of the

---

[5] If the Court holds an evidentiary hearing regarding loss and/or restitution, Mr. Kakkar intends to introduce evidence of fair market value including appraisals and short-sale offers that could reduce the loss amount to zero even if based on the assumption that the entire loan was procured by fraud.

paragraph and requests that it be stricken in its entirety as it is irrelevant to sentencing and not supported by evidence. Further, testimony regarding the alleged "watering down" at the Abigail Hotel was the subject of a pre-trial motion to exclude all such evidence. The Government elected not to present any such testimony at trial.

**P. 5 ¶ 9** – Mr. Kakkar requests that the final sentence regarding the fire investigator's estimate of damages be stricken. Again, this matter was the subject of a comprehensive pre-trial motion. The Court excluded evidence related to the Abigail Hotel fire. Discovery provided by the Government included a report by Douglas Blakely of Koning & Associates, the independent adjustor assigned to evaluate damage in the immediate aftermath of the Abigail Fire. Mr. Blakely's report (Discovery pages 6991-6997) includes a description of the extensive damage resulting from the fire. Koning & Associates received a contractor's comprehensive repair estimate of nearly $586,000 based on Mr. Blakely's observed damages (Discovery pages 6801-6980).

Mr. Kakkar's position is that the last sentence of paragraph 9 impermissibly suggests that an effort was made by Mr. Kakkar, or someone operating at his direction, to increase the insurance recovery from the fire. This suggestion is rebutted by the independent adjustor's property damage observations in the immediate aftermath of the fire (before any "watering down" conduct is alleged to have occurred) and the third-party contractor's estimate as to the repair costs.

**P. 5 ¶ 10** – Mr. Kakkar requests that this paragraph be stricken in its entirety. The 2009 and 2003 fires at the Abigail Hotel have no relevance to the charged offenses. Moreover, materials related to the 2003 fire at the Abigail Hotel were not provided to the defense in discovery (other than an allusion to a 2003 claim in Mr. Blakely's report at p. 6993). Inclusion of information about both fires impermissibly suggests that something improper or possibly illegal occurred regarding one or both insurance claims. For that reason, the paragraph should be removed.

**P. 5 ¶ 11** – Mr. Kakkar requests removal of the two sentences related to a witness claiming "watering down" activity to increase insurance proceeds resulting from the Brookdale

fire. As discussed above regarding paragraph 8 of the PSR, this information was the subject of a pre-trial motion. The witness, Abi Kumar, had significant credibility issues. These problems extend beyond the previously mentioned delay in his disclosure of the alleged watering down conduct and polygraph examination failure about being involved in starting the fire. In addition, Mr. Kumar revealed to interviewing agents that he had offered his information for a price, requesting compensation from an insurance investigator for his information. (Discovery p. 306, ¶ 8).

The last sentence in paragraph 11 is incomplete and misleading. The insurance carrier for the Brookdale, Lloyd's of London, issued two payments to the State Bank of India California (SBIC) as co-payee in the amount of $2,080,000 to cover damage resulting from the August 2009 fire. (Discovery pages 2500 and 3587).

**P. 5 ¶ 12** – The second sentence begins, "In November 2008, Kakkar and his wife applied to SBIC for a $6,000,000 loan …" This statement is inaccurate as written. Discovery pages 3200-3201 show that in June 2008, the Kakkars submitted an application to SBIC to refinance the original $4.5 million loan with a request for an additional $750,000 for renovation of the hotel. SBIC later increased this amount.

Mr. Kakkar also objects to the following statement in the last sentence of paragraph 12: "For funding and administering the $6,000,000 loan, SBIC required Kakkar and his wife to submit their personal tax returns for 2007, and, later, for 2008."

There is no evidence in the record to show that SBIC required Mr. Kakkar's 2007 or 2008 tax returns prior to funding the loan and the statement is inconsistent with the Government's theory at trial. Indeed, the Kakkars' application had been submitted before the 2007 tax return was due (evidence at trial showed they had requested an extension to file by October 15, 2008). The 2008 tax return, in turn, would not have been in existence until the following year, making it impossible for the Kakkars to give it to SBIC.

The Government presented evidence at trial in support of the position that Mr. Kakkar submitted altered tax returns <u>after</u> the loan had funded to induce SBIC to delay in initiating foreclosure proceedings. There was no evidence to support the theory that Mr. Kakkar submitted

altered returns to obtain the refinance loan of $6 million

**P. 6 ¶ 13** – Mr. Kakkar objects to the entire paragraph.

The paragraph states that "[t]he documents provided to the bank for both the initial loan and the refinance showed wildly different number[s] on the defendants' tax returns than the copies of the returns the ATF agent had obtained and reviewed from their tax prepare[r]." The paragraph then goes on to reference Mr. Kakkar's 2007, 2008 and 2009 tax returns.

As the PSR notes in paragraph 12, Mr. Kakkar applied for his initial $4.5 million loan from SBIC in September 2007, before any of the referenced returns could have been generated. There is no evidence in the record that Mr. Kakkar provided any of the referenced tax returns to SBIC in connection with his original loan, and it would have been impossible for him to do so for the years 2008 and 2009. In addition, as previously noted, the evidence shows that the $6 million refinance loan was approved and funded before SBIC received Mr. Kakkar's 2007, 2008 or 2009 returns.

Mr. Kakkar further objects that there is no evidence in the record regarding the origin of tax return documents in SBIC's files, and SBIC's custodian of records, Cindy Sutt, acknowledged not knowing the source or date of receipt of the tax returns at trial.

**P. 6 ¶ 14** – The second and third sentences indicate the following: (1) that $600,000 of the $1.5 million repair loan be handled through a disbursement fund controlled by Dixieline ProBuild Builders Fund; and (2) that the Kakkars were required to submit vouchers for reimbursement to Dixieline. These statements are inaccurate and do not reflect the evidence introduced at trial. Mr. Kakkar objects that these statements are inaccurate and unsupported by evidence.

The Promissory Note (Discovery pp. 5194-5195) signed by Mr. and Mrs. Kakkar reflects a grant of a $6 million loan. It is silent as to disbursement of additional repair funds or designating a fund controller. SBIC mentioned a repair fund subject to a fund controller in the Minutes of SBIC Executive Committee on December 5, 2008 (Discovery p. 21626). That document indicates only that "The disbursal of the [repair] loan will be through a fund controller." Nothing is mentioned about the identity of the controller or what documents needed

to be submitted for release of funds.

**P. 6 ¶¶ 16-17** – Mr. Kakkar objects to the entirety of these two paragraphs. There is no evidence in the record regarding the origin of tax return documents in SBIC's files, and SBIC's custodian of records, Cindy Sutt, specifically disclaimed knowledge regarding the origin of returns. Moreover, as discussed above, the 2007 and 2008 tax returns were not submitted to obtain the refinance loan.

**P. 6 ¶ 18** – The first sentence indicates that the Kakkars were required to provide documentation to gain access to $600,000 of the loan funds. As stated above regarding paragraph 14, SBIC imposed a fund control condition at the very end of the loan process. The language used by SBIC did not contain any specific requirement as to documentation for additional loan draws. At trial, witnesses Romit Basu and Cathy Osberg testified that SBIC appeared to be making inspections of the renovation project and approving construction draws based on progress of the work. Dixieline required submission of invoices as a condition of the loan draws on its own initiative, not based on the requirements in the loan documents.

Mr. Kakkar requests that paragraph 18 be modified to reflect as follows: "Based on the course of conduct of the parties during the loan, a total of $600,000 in construction draws were subject to a Fund Control Agreement. SBIC conducted inspections of the project and approved loan draws. Dixieline imposed a requirement that Mr. Kakkar submit invoices and seek reimbursement of his actual costs. The loan documents were silent as to whether payments would be made based on progress of the work and inspections (SBIC's approach) or cost reimbursement (Dixieline's approach).

**P. 7 ¶ 19** – The first sentence ends by stating that Kakkar "did not actually spend the money on renovations." The trial evidence revealed that Mr. Kakkar did spend money on renovations, but not the full amount requested in the vouchers. Mr. Kakkar requests that the first sentence be modified to reflect that he did use some of the money at issue on renovations.

Dixieline released a total of $510,000 in six separate payments to Mr. Kakkar under the Fund Control Agreement. Mr. Kakkar submitted material receipts showing he paid $3,547 in materials (Discovery p. 39) and $1,000 in labor to Francisco Arriaga (Discovery p. 43) for the

first draw. The second draw included material expenses totaling $12,567 (Discovery pp. 51-83). A third draw included material costs and supporting documents in the amounts of $14,512 (Discovery pp. 93, 96-130) and $2,704 (Discovery pp. 132-149). The fourth draw included material invoices for $15,768 (Discovery pp. 155-200). Invoices for $6,821 of materials (Discovery pp. 204, 208-221) are included along with the fifth draw. Finally, the final invoice included material expenditures of $3,352 (Discovery pp. 227-246). That adds up to material and labor costs of $60,271. These amounts should be deducted from the $510,000 in total funds released pursuant to draws on the Fund Control Account.

**P. 7 ¶ 21 and P. 8 ¶ 22** – Mr. Kakkar objects to the inclusion of information provided by A. Abhimanyu and Ed Hayes. Neither witness testified at trial. Moreover, the information provided by each is unrelated to the charges. Mr. Kakkar requests removal of both paragraphs.

## IV. CONCLUSION

As set forth herein, the sentencing loss attributable to the Government's theory at trial is, at most, $510,000 and the Government has failed to carry its burden to prove the amount of restitution owing (if any) based on the facts of the case. Mr. Kakkar submits that based on a proper calculation of the offense level, a 30-month sentence is appropriate and that no restitution should be ordered. Mr. Kakkar further requests that the Court consider a downward departure based on the likely extrajudicial consequences of conviction.

Dated: March 27, 2017

By: /s/ Eduardo G. Roy
EDUARDO G. ROY
Attorney for Defendant
SANJIV KAKKAR